**Ruslan RAZILOV, Sara Lapham, and Derek Lapham, Plaintiffs,**

v.

**NATIONWIDE MUTUAL INSURANCE COMPANY and Allied Group, Inc., Defendants.**

**No. CV 01–1466–BR.**

United States District Court,
D. Oregon.

Jan. 21, 2003.

Mark A. Friel, N. Robert Stoll, Steve D. Larson, Steven C. Berman, Stoll Stoll Berne Lokting & Shlachter P.C., Portland, OR, Charles A. Ringo, Beaverton, OR, for Plaintiffs.

Heidi L. Mandt, Jan K. Kitchel, Joshua P. Stump, Schwabe, Williamson & Wyatt, P.C., Richard J. Kuhn, Hoffman, Hart & Wagner LLP, Portland, OR, for Defendants.

## OPINION AND ORDER

BROWN, District Judge.

This matter comes before the Court on Defendants' Renewed Motion for Summary Judgment (# 57).

Ruslan Razilov, Jason Boutros, Sara Lapham, and Derek Lapham brought this class action on behalf of individuals who purchased personal lines of insurance from Defendants Nationwide Mutual Insurance Company (Nationwide) and Allied Group, Inc. (Allied) and from their subsidiaries and affiliates from October 1999 to the

present. Plaintiffs allege Defendants used information in consumer reports when underwriting or rating such insurance policies, took adverse action against Plaintiffs and others based on such information, and then failed to provide notice of their adverse action as required by the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681, *et seq.* Plaintiffs seek statutory damages, punitive damages, and attorneys' fees.

Nationwide moved to dismiss the action. The Court heard oral argument on March 18, 2002, and denied the Motion. Nationwide then filed its first Motion For Summary Judgment on July 15, 2002. After Boutros and Razilov filed a First Amended Complaint on August 5, 2002, adding the Laphams as plaintiffs and Allied as a defendant, Nationwide withdrew its Motion for Summary Judgment. Shortly thereafter, Plaintiff Boutros voluntarily dismissed his claim.

On September 6, 2002, Defendants filed their Renewed Motion for Summary Judgment. Defendants seek dispositive rulings on three grounds. First, Allied asserts it does not use consumer credit reports when underwriting insurance because it is "simply a stock holding company and does not underwrite insurance." Allied argues, therefore, it could not have taken any adverse action against Plaintiffs as a matter of law. Second, Nationwide contends Razilov's alleged FCRA injury is not "fairly traceable" to Nationwide as a matter of law because Nationwide did not issue Razilov's policy. In any event, Nationwide maintains it did not take any adverse action against Razilov even if it gave consumer credit information to AMCO Insurance Company (AMCO), the entity that issued Razilov's policy. Finally, Nationwide argues this Court lacks jurisdiction to adjudicate the claims of the Laphams, who are Texas residents, against Nationwide.

After a thorough review of the record, the Court concludes Defendants have failed to establish definitively that Allied is "simply a holding company and does not underwrite insurance," which is the premise of Defendants' Motion applicable to Allied. In addition, because Defendants did not refute or address many of the facts Plaintiffs asserted in their Response to Defendants' Concise Statement of Facts, the Court deems Plaintiffs' version of those facts admitted for purposes of this Motion. When viewing the record in the light most favorable to Plaintiffs, the Court concludes fact issues exist concerning Allied's role, if any, in the alleged taking of adverse action against policyholders based on consumer reports in violation of FCRA. As a consequence, the Court cannot resolve on this record Allied's contention that it did not take any adverse action against any Plaintiff as a matter of law. The Court, therefore, **DENIES** this part of Defendants' Motion.

The Court concludes, nonetheless, Plaintiffs have not established Razilov suffered an injury fairly traceable to the actions of Nationwide based on the plain language of § 1681m. The Court finds, therefore, Nationwide is entitled to summary judgment on Razilov's claims as a matter of law because Razilov lacks standing to bring those claims against Nationwide. Accordingly, the Court **GRANTS** this part of Defendants' Motion.

Finally, the Court finds it has jurisdiction over the Laphams' claims against Nationwide and **DENIES** this part of Defendants' Motion.

### *STANDARDS*

**1. Summary Judgment**

Fed.R.Civ.P. 56(c) authorizes summary judgment if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law. The moving party must show the

absence of an issue of material fact. *Arpin v. Santa Clara Valley Transp. Agency,* 261 F.3d 912, 919 (9th Cir.2001). In response to a properly-supported motion for summary judgment, the nonmoving party must go beyond the pleadings and show there is a genuine issue of material fact for trial. Fed.R.Civ.P. 56(e).

An issue of fact is genuine " 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Guidroz–Brault v. Mo. Pac. R.R. Co.,* 254 F.3d 825, 829 (9th Cir.2001) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). All reasonable inferences from the facts in the record must be drawn in favor of the nonmoving party. *Hensley v. Northwest Permanente P.C. Ret. Plan & Trust,* 258 F.3d 986, 999 (9th Cir.2001), *cert. denied,* 534 U.S. 1082, 122 S.Ct. 815, 151 L.Ed.2d 699 (2002). A mere disagreement about a material issue of fact, however, does not preclude summary judgment. *Jackson v. Bank of Haw.,* 902 F.2d 1385, 1389 (9th Cir.1990). The substantive law governing a claim or a defense determines whether a fact is material. *Addisu v. Fred Meyer, Inc.,* 198 F.3d 1130, 1134 (9th Cir. 2000).

### 2. Statutory Construction

When a district court interprets a federal statute, it must apply a two-part analysis. "The first and most important step in construing a statute is the statutory language itself." *Royal Foods Co. v. RJR Holdings, Inc.,* 252 F.3d 1102, 1106 (9th Cir.2001) (citing *Chevron USA v. Natural Res. Def. Council,* 467 U.S. 837, 842–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). The court must look to the text of the statute to " 'determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.' " *Id.* (quoting *Robinson v. Shell Oil Co.,* 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997)).

"The meaning—or ambiguity—of certain words or phrases may only become evident when placed in context." *Food and Drug Admin. v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 132, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000). Accordingly, it is a " 'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.' " *Id.* at 133, 120 S.Ct. 1291 (quoting *Davis v. Michigan Dep't of Treasury,* 489 U.S. 803, 809, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989)). A court, therefore, must "interpret the statute as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into an harmonious whole." *Food and Drug Admin. v. Brown & Williamson Tobacco Corp.,* 529 U.S. at 133, 120 S.Ct. 1291 (internal quotations and citations omitted).

 If the congressional intent is clear from the plain meaning of the statute, the court need not look any further for guidance. *Id.* If the statute is ambiguous, however, the court must proceed to the second step and determine the meaning of the statutory language by giving deference to the governing agency's interpretation as long as that interpretation is permissible. *Id.* at 132, 120 S.Ct. 1291. If there is no agency interpretation and the text of the statute is ambiguous, the court may look to legislative history as an aid to discern congressional intent. *In re Bankruptcy Estate of MarkAir, Inc.,* 308 F.3d 1038, 1043 (9th Cir.2002). *See also Merkel v. Comm'r,* 192 F.3d 844, 848 (9th Cir.1999) ("[I]f the statute is ambiguous, we consult the legislative history, to the extent that it is of value, to aid in our interpretation.").

### *FCRA*

 When Congress enacted FCRA, it required consumer credit reporting agencies to adopt procedures for meeting the

needs of business in a manner both fair and equitable to the consumer. *See* 15 U.S.C. § 1681(b). The purpose of FCRA is to protect consumers from the transmission of inaccurate information about them. *Guimond v. Trans Union Credit Info. Co.,* 45 F.3d 1329, 1333 (9th Cir.1995).

Under FCRA, a consumer reporting agency may furnish consumer reports:

> (3) To a person which it has reason to believe—
>
> (A) intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer; or
>
> (B) intends to use the information for employment purposes; or
>
> (C) intends to use the information in connection with the underwriting of insurance involving the consumer; or
>
> (D) intends to use the information in connection with a determination of the consumer's eligibility for a license or other benefit granted by a governmental instrumentality required by law to consider an applicant's financial responsibility or status; or
>
> (E) intends to use the information, as a potential investor or servicer, or current insurer, in connection with a valuation of, or an assessment of the credit or prepayment risks associated with, an existing credit obligation; or
>
> (F) otherwise has a legitimate business need for the information—
>
>> (i) in connection with a business transaction that is initiated by the consumer; or
>>
>> (ii) to review an account to determine whether the consumer contin-

ues to meet the terms of the account.

15 U.S.C. § 1681b(3).

In addition to governing the conduct of consumer reporting agencies, FCRA requires the user of information provided by consumer reporting agencies to satisfy certain responsibilities. 15 U.S.C. § 1681m(a) provides:

> If any person takes any adverse action with respect to any consumer that is based in whole or in part on any information contained in a consumer report, the person shall—
>
> (1) provide oral, written, or electronic notice of the adverse action to the consumer;
>
> (2) provide to the consumer orally, in writing, or electronically—
>
>> (A) the name, address, and telephone number of the consumer reporting agency ... that furnished the report to the person; and
>>
>> (B) a statement that the consumer reporting agency did not make the decision to take the adverse action and is unable to provide the consumer the specific reasons why the adverse action was taken; and
>
> (3) provide to the consumer an oral, written, or electronic notice of the consumer's right—
>
>> (A) to obtain ... a free copy of a consumer report on the consumer from the consumer reporting agency ... which notice shall include an indication of the 60–day period under that section for obtaining such a copy; and
>>
>> (B) to dispute ... with a consumer reporting agency the accuracy or completeness of any information in a consumer report furnished by the agency.

Similarly, a person or entity that takes an adverse action against a consumer based on certain information provided by

an entity related by common ownership or affiliated by common corporate control also has certain obligations under FCRA.

15 U.S.C. § 1681m(b)(2) provides:

(A) Duties, generally. If a person takes an action described in subparagraph (B) with respect to a consumer, based in whole or in part on information described in subparagraph (C), the person shall [give notice to the consumer].

 * * * * * *

(B) Action described. An action referred to in subparagraph (A) is . . . any adverse action described in clause (i) or (ii) of section 1681a(k)(1)(B) of this title.

(C) Information described. Information referred to in subparagraph (A)—

 (i) except as provided in clause (ii), is information that—

 (I) is furnished to the person taking the action by a person related by common ownership or affiliated by common corporate control to the person taking the action; and

 (II) bears on the credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living of the consumer; and

 (ii) does not include—

 (I) information solely as to transactions or experiences between the consumer and the person furnishing the information; or

 (II) information in a consumer report.

In connection with insurance, FCRA defines an "adverse action" to include:

(i) a denial or cancellation of, an increase in any charge for, or a reduction or other adverse or unfavorable change in the terms of coverage or amount of, any insurance, existing or applied for, in connection with the underwriting of insurance . . . .

15 U.S.C. § 1681a(k)(1)(B)(i).

### FACTS

The factual record on Defendants' Motion is not a model of clarity. Defendants combined in one Motion diverse arguments involving Allied, Nationwide, a nonparty entity described as "Nationwide Lloyds Insurance Company," as well as other insuring entities. Defendants failed to provide a clear, concise, undisputed factual record that identifies these entities and definitively explains their role, if any, in taking adverse action against any named Plaintiffs. In addition, Defendants did not support all of the assertions they made in their Concise Statement of Facts with citations to the evidentiary record as required by Local Rule (LR) 56.1(c). Defendants also did not admit or deny many of the facts Plaintiffs asserted in their Response to Defendants' Concise Statement of Facts.

LR 56.1(b)(3) states: "In the same manner as set forth in LR 56.1(b)(1) [accepting or denying each fact], the moving arty shall reply to the responding party's additional facts." LR 56.1(f) provides:

For purposes of a motion for summary judgment, material facts set forth in the concise statement of the moving party, *or in the response* to the moving party's concise statement, *will be deemed admitted* unless specifically denied, or otherwise controverted by a separate concise statement of the opposing party.

(Emphasis added.)

In addition, LR 56.1(e) provides:

Except as otherwise required by law, when resolving a motion for summary judgment, the court has no independent duty to search and consider any part of the court record not otherwise refer-

enced in the separate concise statements of the parties.

As a consequence, the lengthy, factual record in this case is remarkably unhelpful and fraught with potentially immaterial details introduced by Plaintiffs, which the Court, nonetheless, must consider as deemed admissions.

As best the Court can tell, therefore, the following facts either are undisputed or deemed admitted except when otherwise noted:

AMCO, who is not a party to this action, issued and sold the relevant insurance policies to Razilov. The parties do not specify, however, the respective roles of AMCO and the entity or entities that underwrote the policies. The parties also fail to make clear whether they agree AMCO, as issuer, took adverse action against Razilov when it adjusted premiums for his policies based on information in his consumer credit report.

In paragraph 34 of their Response to Defendants' Concise Statement of Facts, Plaintiffs assert "Razilov was charged more for insurance *by defendants* based in part on information contained in his credit report." (Emphasis added.) As noted, AMCO is not a named defendant. The only evidence Plaintiffs cite in support of the assertion that "Defendants" charged Razilov an increased premium is Defendants' response to a request for admission in which they state:

> As to an action taken by one of its subsidiary companies, Allied Group, Inc., admits that AMCO Insurance Company adjusted plaintiff Razilov's renewal premium for his automobile insurance policy based on information in a consumer report.

Friel Aff., Ex. 28 at 2. Defendants, however, neither admitted nor denied Plaintiffs' assertion. For purposes of this Motion, therefore, the Court accepts as undisputed that AMCO adjusted Razilov's renewal premium adversely based on information in a consumer report.[1] The Court notes, however, Plaintiffs do not offer any factual evidence to show "Defendants" charged Razilov more for insurance based in part on information contained in his consumer credit report.

AMCO is a subsidiary of Defendants Allied and Nationwide. Allied is a regional insurance holding company incorporated under the laws of the State of Iowa. Allied also is a wholly-owned subsidiary of Nationwide and refers to its group of subsidiaries collectively as "Allied Insurance, a Member of Nationwide Insurance." The name "Allied Insurance" refers to Allied, AMCO, Allied Property & Casualty Company, Depositors Insurance Company, and Nationwide. Allied, AMCO, Allied Property & Casualty Company, and Depositors Insurance Company are listed on Allied's letterhead.

Allied owns the domain name for and hosts the website "www.alliedinsurance.com" The website enables Allied policyholders in Oregon and elsewhere to sign up for a "myAlliedPolicy.com" personal account through which they can obtain up-to-date information about their policies, track billing, determine the status of claims, and arrange for the automatic payment of premiums. Neither Allied nor its subsidiaries have any employees. The president of Allied has day-to-day responsibilities for overseeing the activities of Allied and its "downstream subsidiaries."

Defendants contend Allied is a stock holding company and support that assertion with (1) references from the 2000 Form B Holding Company System Registration Statement filed with the Insurance Department of the State of Ohio that, in

---

1. Plaintiffs do not contend AMCO failed to give Razilov the required FCRA notice.

turn, reflects Allied is a stock corporation and a property and casualty insurance holding company and (2) a notarized letter from the Oregon Department of Consumer and Business Services in which the Department states Allied is "known as a stock holding company." Plaintiffs dispute, however, that Defendants provided sufficient evidence to establish Allied is merely a stock holding company.

The parties agree Allied does not hold a current certificate of authority to write insurance in Oregon. In addition, Defendants contend Allied has never applied for such authority. Plaintiffs, however, assert Defendants did not provide any evidence to support this contention. Defendants rely on a notarized letter from the Oregon Department of Consumer and Business Services in which the Department indicates Allied is not currently a licensed entity in the state of Oregon. In that letter, the Department also concludes that Allied would not be licensed as an insurance company transacting insurance business in Oregon because it is "known as" a stock holding company.

Nationwide is licensed to sell insurance in Oregon. Nationwide employs all of the individuals who make underwriting, rating, or FCRA compliance decisions on behalf of Nationwide, Allied, and their subsidiaries.

Nationwide also establishes the policies and procedures for itself and its subsidiaries (including Allied) regarding the use of consumer credit information for underwriting and rating personal lines of insurance. Nationwide markets through exclusive agents; independent agents; direct responses; the Internet; and bank, worksite, and affinity partnerships. Nationwide owns and hosts the website "www.nationwide.com," which allows policyholders, including those in Oregon, to sign up for a "MyNationwide" personal account. The personal account allows policyholders to view policy details, to make changes to policies, to view policy forms and endorsements, to check billing information, and to get information on claims. Nationwide also provides insurance quotes and sells insurance directly through its website.

Nationwide prepared and filed the 2000 Form B Insurance Company Registration Statement with the Ohio Insurance Department on behalf of numerous subsidiaries. The Statement identifies Nationwide as the "ultimate controlling company." Nationwide and certain entities owned by Nationwide and Allied, may advertise, solicit, underwrite, and perform actuarial services for one another. Nationwide and Allied have contracted with TransUnion, LLC, to obtain credit reports for their use and for their subsidiaries' use in connection with underwriting insurance.

In December 1999, Nationwide's Director of Product Compliance and its Product Compliance Specialist exchanged emails in which they discussed efforts to ensure that Nationwide's subsidiary, Colonial County Mutual Insurance Company,[2] was in compliance with Nationwide's FCRA guidelines. Colonial does business all over the United States. Nationwide's Director of Product Compliance also sent emails to all Nationwide State Product Directors and State Officers, including the Vice President of Allied's staff underwriting operation, providing guidelines for agents and service centers regarding compliance with the Gramm–Leach–Bliley Act and FCRA.

In addition, The Vice President responsible for pricing Nationwide's personal lines of insurance has some oversight responsibility for the setting of rates for insurance issued through a number of Nationwide subsidiaries and affiliates. Some

**2.** Colonial County Mutual Insurance Company is not a party to this action.

insurance policies issued through Nationwide subsidiaries are partially managed by Nationwide's home office in Ohio. Nationwide filed with the Oregon Insurance Division a table that showed proposed rate changes for companies owned by Allied and that indicated Nationwide and AMCO use the same financial stability discounts for rating personal lines of insurance. In September 2000, Allied made an insurance rate and rule filing with the State of Oregon on behalf of Nationwide. The Director of Product Compliance for Nationwide also has shared information regarding Nationwide policies and procedures with the Vice President of Allied's staff underwriting operation.

Nationwide's 1998 merger with Allied provided Nationwide with the opportunity to grow through approximately 3,000 independent agencies. Allied assumed responsibility for Nationwide's independent agency system. Allied also uses Nationwide's registered "frame" mark.

The Plaintiffs Lapham are residents of Texas and have never been residents of Oregon. While the Laphams resided in Texas, Nationwide issued their automobile insurance policy, and "Nationwide Lloyds," an affiliate of Nationwide that is a Texas company doing business in Texas, issued the Lapham's homeowners policy. In addition, Defendants contend the Laphams' policies were issued under the laws of the State of Texas, and Nationwide Lloyds "only" does business in Texas. Although Plaintiffs assert Defendants did not submit evidence to support these assertions, this dispute is immaterial to the resolution of this Motion. The Court, therefore, does not need to consider it.

### DISCUSSION

As noted, Defendants renewed their Motion for Summary Judgment on the following grounds: (1) Allied has no liability under FCRA because it is a stock holding company, and does not underwrite insurance and, therefore, could not "take" adverse action as a matter of law; (2) Razilov has no standing against Nationwide because he has never been a Nationwide policyholder and no FCRA injury is fairly traceable to Nationwide; and (3) the Court does not have personal jurisdiction over the claims of Texas residents Sara Lapham and Derek Lapham.

In response, Plaintiffs argue: (1) FCRA requires notice to be given to a consumer by any person or entity, including but not limited to an insurer, who takes an adverse action based on information contained in a consumer credit report; (2) Nationwide took or participated in taking adverse action against Plaintiffs when it set guidelines for the use of credit scores by Nationwide and its subsidiaries in the underwriting and rating of insurance; (3) the Laphams consented to this Court's jurisdiction by filing their claim in this Court; (4) general jurisdiction exists over Nationwide; and (5) Nationwide waived any objection to this Court's personal jurisdiction over Nationwide when it filed a Motion to Dismiss and failed to raise that defense.

**1. On this record, the Court cannot determine whether Allied took adverse actions against any Plaintiff and, then, failed to give the required FCRA notice.**

As noted, to determine whether Allied took adverse action against any Plaintiff, the Court first must attempt to determine the plain meaning of the language in certain FCRA provisions.

Section 1681m(a) of Title 15 provides:

If *any person takes any adverse action* with respect to any consumer that is based in whole or in part on any infor-

mation contained in a consumer report, *the person shall*—[provide notice] ....

(Emphasis added.)

Section 1681m(b) provides:

*If a person takes an action* described in subparagraph (B) [adverse action described in section 1681a(k)(1)(A) or in clause (i) or (ii) of section 1681a(k)(1)(B)] with respect to a consumer, based in whole or in part on information described in subparagraph (C), *the person shall*-[provide notice]. ...

(Emphasis added.)

The plain language of the statute requires any person who takes an adverse action against a consumer to give notice to that consumer. "Person" includes "any individual, partnership, corporation, trust, cooperative, association, government or governmental subdivision or agency, or other entity." 15 U.S.C. § 1681a(b). Allied is a corporation and, therefore, a "person" for purposes of FCRA liability.

As previously noted, FCRA defines an "adverse action" to include:

(i) a denial or cancellation of, an increase in any charge for, or a reduction or other adverse or unfavorable change in the terms of coverage or amount of, any insurance, existing or applied for, in connection with the underwriting of insurance ....

15 U.S.C. § 1681a(k)(1)(B)(i).

Defendants argue Allied does not issue or underwrite insurance policies and Allied is, in fact, a stock holding company that is not licensed to write insurance in Oregon. Defendants also contend mere participation in the taking of an adverse action is not actionable under FCRA as a matter of law. Accordingly, Defendants maintain Allied was incapable of taking an adverse action against any Plaintiff.

According to Plaintiffs, however, "Allied Group uses insurance scores to rate or underwrite auto insurance policies issued by AMCO and Nationwide, including in Oregon." Pls.' Resp. to Defs.' Concise Statement of Facts at ¶ 26. Plaintiffs support this assertion with the deposition testimony of Melinda H. Oosten, the Senior Actuarial Officer in charge of pricing for Allied. Friel Aff., Ex. 2 at 4–5. Plaintiffs also assert Allied contracted with TransUnion to obtain credit reports for use by Allied and its subsidiaries in connection with underwriting insurance. Plaintiffs support this assertion with the Service Agreement between Allied and TransUnion and the deposition testimony of Daniel D. Ellet. The Court must accept these assertions as true for purposes of this Motion because Defendants did not directly dispute either of them. Defendants only provided evidence that Allied currently lacks a license to write insurance in Oregon and failed to establish that Allied is merely a stock holding company. Accordingly, the Court assumes for purposes of this Motion that Allied underwrites automobile policies issued by AMCO in Oregon and uses insurance scores based on consumer credit reports when doing so.

For the permissible purpose of "underwriting," the Federal Trade Commission (FTC) has provided:

An insurer may obtain a consumer report to decide whether or not to issue a policy to the consumer, the amount and terms of coverage, the duration of the policy, the rates or fees charged, or whether or not to renew or cancel a policy, because these are all "underwriting" decisions.

Comment 604(3)(C)–1, 16 C.F.R. Pt. 600, App. (2002).

To "underwrite" means "to set one's name to (an insurance policy) for the purpose of thereby becoming answerable for a designated loss or damage on consideration of receiving a premium percentage: insure on life or property; also: to assume

liability for (a sum or risk) as an insurer." *Merriam–Webster's Collegiate Dictionary* at 1289 (10th ed.1998).

Although Defendants argue it is impossible for Allied to deny, to cancel, or to change any customer's insurance policy because Allied does not issue insurance policies, neither party has provided this Court with undisputed facts that identify the scope of Allied's assumed role as an underwriter of the policies at issue. That ambiguity is heightened because the Court also must draw all inferences favorable to Plaintiffs as the nonmoving parties.

■ For purposes of this Motion, therefore, the Court concludes Defendants have failed to establish the premise that underlies this part of Defendants' Motion; that is, that Allied is a stock holding company and does not underwrite insurance. The existence of issues of fact, therefore, preclude the Court from granting summary judgment in favor of Allied. Accordingly, the Court denies the part of Defendants' Renewed Motion for Summary Judgment relating to Allied.

**2. Razilov does not have standing to bring this action against Nationwide.**

■ "[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Medina v. Clinton,* 86 F.3d 155, 157 (9th Cir.1996) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). The three elements of standing are:

First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not conjectural or hypothetical.'

Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan,* 504 U.S. at 560, 112 S.Ct. 2130 (ellipses and brackets in original; internal quotations and citations omitted). The plaintiff bears the burden of establishing these elements. *Id.* In response to a summary judgment motion, the plaintiff cannot rest on mere allegations but must set forth by affidavit or other evidence specific facts that will be taken to be true for purposes of the summary judgment motion. *Id.*

Nationwide contends it is entitled to summary judgment because Razilov does not have standing to bring this claim against Nationwide. Nationwide argues Razilov cannot show (1) he personally suffered actual or threatened injuries as the result of Nationwide's conduct, (2) his alleged injuries are fairly traceable to Nationwide's actions, and (3) he is likely to receive a favorable decision by this Court as to his claims. In addition, Nationwide insists it could not have taken adverse action against Razilov because Nationwide never insured Razilov.

According to Plaintiffs, however, "Razilov, through guidelines set up by Nationwide, and through actions of Nationwide employees, was charged more for insurance based in part on information contained in his credit report."[3] To support this contention, Plaintiffs offer evidence that Nationwide established policies and

---

**3.** During oral argument on January 6, 2003, in a related case, *Sams v. Geico,* CV 01–1458–BR, Plaintiffs' counsel clarified that Plaintiffs in this matter assert only that Defendants are direct statutory "takers" of adverse action. Specifically, Plaintiffs do not argue Defendants in this case are liable under theories of agency or alter ego.

procedures regarding the use of consumer credit information, contracted for credit reports from a third party, took steps to ensure subsidiary compliance, made rate filings with the Oregon Insurance Division, and shared information with subsidiaries. Plaintiffs also assert Nationwide "takes or participates in taking adverse actions when using information from consumer credit reports for the purpose of underwriting and/or rating personal lines of insurance."

### a. According to the plain language and context of the statute, a person "takes" an adverse action in connection with insurance when the person denies, cancels, increases in price, or reduces or changes adversely the terms or amount of insurance.

As noted, the parties do not dispute the notice requirements of 15 U.S.C. § 1681m(a) and (b) explicitly apply to any person who "takes" any "adverse action" against a consumer based on a consumer credit report. For purposes of Defendants' Motion, the parties also agree adverse action was taken against Razilov based on his consumer credit information. The question whether Razilov suffered a FCRA injury fairly traceable to Nationwide depends, therefore, on whether Nationwide took adverse action against Razilov, which, in turn, depends on the meaning of "takes" within the scope of the statute. This, apparently, is a question of first impression.

■ Unless otherwise defined, a court must interpret the words of a statute by their ordinary, contemporary, common meaning. *See Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979)(citing *Burns v. Alcala*, 420 U.S. 575, 580–81, 95 S.Ct. 1180, 43 L.Ed.2d 469

(1975)). "Take" is the operative verb in § 1681m(a) and § 1681m(b) that triggers the duty to provide a notice to the consumer. As used in § 1681m, the verb "take" is transitive and "adverse action" and "action" are the direct objects that complete the verb's meaning.[4] The dictionary definition of "take" as a transitive verb is extensive. *Merriam–Webster's Collegiate Dictionary* at 1201 (10th ed.1998). The most reasonable definition of "take" in this particular statutory context, however, is "to undertake and make, do, or perform ... ( [take] legal action)." *Id.*

■ Applying this plain-meaning, dictionary definition, a person "takes" an adverse action when the person does or performs the action. Carrying that meaning to the statutory definition of "adverse action", then, a person "takes" an adverse action in connection with insurance when the person denies, cancels, increases in price, or reduces or changes adversely the terms or amount of insurance based on information in a consumer credit report. Applying this interpretation, the Court concludes the statute is not ambiguous.

■ The Court also concludes this interpretation is consistent with the statutory scheme as a whole. For example, in *Obabueki v. Int'l Business Mach. Corp.*, the court applied § 1681b(b)(3) and § 1681a(k)(1)(B)(ii) in the employment context and held that an employer's internal decision adverse to a job applicant was not in itself, the taking of adverse action. 145 F.Supp.2d 371 (S.D.N.Y.2001). In *Obabueki*, a prospective employer withdrew an offer of employment on the basis of the job applicant's consumer report. The applicant asserted the prospective employer violated the FCRA provision that provides:

---

**4.** A transitive verb expresses "an action carried from the subject to the object; requiring a direct object to complete meaning. Use of a verb or verb construction." *The American Heritage Dictionary of the English Language* 1833 (4th ed.2000).

"[B]efore taking any adverse action based in whole or in part on the report, the person intending to take such adverse action shall provide the consumer [certain information]." *See* § 1681b(b)(3). The applicant argued the defendant already had "taken adverse action" through its internal decision-making process, which occurred before defendant sent him a letter that indicated its intent to withdraw the conditional offer of employment. Although the definition of "adverse action" in the employment context requires "a denial of employment or any other decision for employment purposes that adversely affects any current or prospective employee," the court concluded "[a]n internal decision to rescind an offer is not an adverse action," *Id.* at 392. *See* § 1681a(k)(1)(B)(ii). The court noted "IBM's internal discussions had no impact on plaintiff; only when its staff *acted* by [a second] letter did IBM *take* any action." *Id.* (emphasis added). The same reasoning applies under § 1681m(a). The consumer is entitled to a FCRA notice in the insurance context when the adverse act is performed; that is, when the insurance is denied or cancelled, or when premium rates are increased, or when the terms or amount of insurance are reduced or changed adversely.

### b. Mere participation in the decision that leads to an adverse action is insufficient.

Plaintiffs contend anyone who participates in the decisions that lead to an adverse action thereby participates in the taking of the action and, therefore, also must provide notice under § 1681m(a).

As noted, the plain language of § 1681m(a), however, extends only to a person who "takes" the adverse action. If Congress intended to include participant liability, it could have done so explicitly as it did in the Equal Credit Opportunity Act. *See* 15 U.S.C. § 1691a(e)("The term 'credi-tor' means any person who regularly extends, renews, or continues credit; any person who regularly arranges for the extension, renewal, or continuation of credit; *or any assignee of an original creditor who participates in the decision* to extend, renew, or continue credit.")(emphasis added).

The only authority Plaintiffs offer in support of this argument is an unpublished opinion in which the court certified a class of consumers against whom the defendant "took or participated in adverse action based in whole or in part upon information in a consumer report." *See Mick v. Level Propane Gases, Inc.*, No. 98–CV–959, 1999 WL 33453772, at *19 (S.D.Ohio Sept. 29, 1999). In that case, defendant allegedly submitted the consumer information for credit verification, then denied service, required a security deposit, or charged a higher price for consumers who had poor credit scores under a credit-scoring program. *Id.* The Court finds this decision unpersuasive.

As noted, the purpose of FCRA is to protect consumers from the transmission of inaccurate information about them. *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d at 1333. This purpose is accomplished by informing consumers that their credit history has been used and providing consumers with the information they need to determine whether the information contained in their accessed consumer reports is accurate or needs to be corrected. *See* § 1681m. A consumer does not need multiple notices from various "participants" about the same adverse action in order to receive the protection afforded by FCRA. To the contrary, multiple notices regarding the same transaction would be confusing and could suggest erroneously that more than one adverse action had been taken. In any event, the statute does not contain any language that indicates Congress in-

tended to require all persons or entities who participated in decisions that led to adverse action to give notice in order to achieve the purpose of the statute.

▮▮▮ For these reasons, the Court declines to read "participant" liability into the plain language of § 1681m(a).

### c. There is no contrary statutory interpretation by the Federal Trade Commission (FTC).

The Court has construed the plain meaning of the statute and concluded the statute is not ambiguous. To complete the analysis, in any event, the Court also considered existing interpretations of the FTC, the federal agency charged with enforcing FCRA. *See* 15 U.S.C. § 1681s. The FTC has interpreted FCRA in staff opinion letters and issued an official Commentary on FCRA in 1990. *See* 16 C.F.R. pt. 600, App., Commentary on Fair Credit Reporting Act (FTC Commentary)(2002). The FTC Commentary constitutes advisory guidelines, and staff opinion letters constitute nonbinding interpretations. 16 C.F.R. pt. 600, App. § 621 at 3. *See also* 16 C.F.R. §§ 1.1–1.3 (FTC information opinions and their nonbinding effect). In light of the 1996 legislative amendments to § 1681m and the addition of the definition of "adverse action," however, much of the existing FTC Commentary may be outdated. In fact, the FTC has recently announced its intention to ask for public comment on a proposed revision to the FCRA Commentary, 16 CFR 600. *See* FTC website <www.ftc.gov/os/statutes/fcrajump.htm> (Jan. 7, 2003). The Court notes, however, the Commission states in the notice its intent to request public comments is not a determination on the need for or the substance of the rule, guides, and statements of policy. *See* FTC website <www.ftc.gov/os/2003/01/16cfr1frn.htm> (Jan. 21, 2003).

Having reviewed the FTC record, the Court does not find anything in the FTC's interpretations of FCRA to contradict this Court's construction of the statute.

### d. There is no contrary legislative history.

Even when "the express language of a statute appears unambiguous, a court must look beyond that plain language where a literal interpretation of this language would thwart the purpose of the overall statutory scheme, would lead to an absurd result, or would otherwise produce a result demonstrably at odds with the intentions of the drafters." *Royal Foods Co. v. RJR Holdings, Inc.*, 252 F.3d at 1108 (internal quotations and citations omitted). A review of the pertinent House and Senate Reports pertinent to FCRA, however, does not reveal anything in the legislative history to contradict this Court's interpretation of § 1681m.

The 1996 Amendments, P.L. 104–208, significantly revised § 1681m(a) and § 1681m(b) and, among other things, added the definition of "adverse action." The 1996 Amendments were the product of Congress's consideration of bills from 1990 until their enactment as the Consumer Credit Reporting Act of 1996, which was part of the Economic Growth and Regulatory Paperwork Reduction Act of 1996 contained in the Omnibus Consolidated Appropriations Bill of 1996. *See generally,* Joseph L. Seidel, *The Consumer Credit Reporting Reform Act: Information Sharing and Preemption,* 2 N.C. Banking Inst. 79 (1998).

The House and Senate Reports do not discuss, and the parties do not point to, any consideration in the House and Senate Reports of participant or joint affiliate liability for the taking of an adverse action. *See, e.g.,* H.R.Rep. No. 102–692 (1992); S.Rep. No. 103–209 (1993); H.R.Rep. No. 103–486 (1994); S.Rep. No. 104–185 (1995).

Various House Reports indicate, however, the definition of "adverse action" was meant to be interpreted broadly and to parallel generally the "permissible purpose" provisions in § 1681b(3). An early House Report indicated examples provided in the definition of "adverse action" were meant to be "illustrative" rather than definitive. H.R.Rep. No. 102–692, at 21 (1992). In addition, "whenever a consumer report is obtained for a permissible purpose[,] ... a denial of a benefit based on the report triggers the adverse action notice requirements." H.R.Rep. No. 102–692, at 21 (1992). *See also* S.Rep. No. 103–209, at 8 (1993); H.R.Rep. No. 103–486 (1994).

In addition, legislative history reflects Congress's general intent to liberalize the sharing of information among affiliates. S.Rep. No. 103–209, at 8 (1993). The 1995 Senate Report, which accompanied the bill preceding the final 1996 Amendments, indicated:

> Title IV will clarify that affiliates within a holding company structure can share any application information (last year's bill was limited to credit applications) and consumer reports, consistent with the FCRA. Under current law, such information can be deemed a "consumer report" and the information sharing entity can be deemed a "consumer reporting agency," thereby implicating all the restrictions of the FCRA. The affiliate sharing provisions of this Title will allow affiliates to share such information without being deemed a consumer reporting agency.

S.Rep. No. 104–185, at 20 (1995).

The 1995 Senate Report explains the definition of "adverse action," which was identical to the definition enacted in 1996, and refers to adverse determinations without differentiating between the decision to act and the action itself. S.Rep. No. 104–185, at 32 (1995).

Based on the foregoing, the Court concludes the legislative history does not suggest this Court's interpretation of the plain language in § 1681m would thwart the purpose of the overall statutory scheme, lead to an absurd result, or produce a result at odds with the intentions of Congress.

In summary, the Court concludes a person "takes" an adverse action in connection with insurance when the person denies, cancels, increases in price, or reduces or changes adversely the terms or amount of insurance. Even though an affiliate or commonly-owned entity may have a role in establishing a decision-making process and may provide information or set policies, guidelines, and standards that lead to the taking of an adverse action, the statute only requires the person who takes the adverse action to notify the consumer. Because Plaintiffs did not show Nationwide denied, cancelled, increased the price, reduced or changed adversely the terms of Razilov's insurance, Plaintiffs have failed to establish that Razilov has standing to bring his FCRA claim against Nationwide. The Court, therefore, grants summary judgment to Nationwide as to Plaintiff Razilov's claims.

**3. This Court has personal jurisdiction over the claims of Sara Lapham and Derek Lapham.**

■ Personal jurisdiction over a nonresident defendant is proper only if the forum state's long-arm statute confers personal jurisdiction and the exercise of jurisdiction comports with federal due process standards. *Fireman's Fund Ins. Co. v. National Bank of Coops.*, 103 F.3d 888, 893 (9th Cir.1996) (emphasis added). "Oregon's long-arm statute confers jurisdiction to the extent permitted by due process." *Gray & Co. v. Firstenberg Mach. Co.*, 913 F.2d 758, 760 (9th Cir.1990). *See also* Or. R. Civ. P. 4L. Due process re-

quires a nonresident defendant to have certain minimum contacts with the forum state to ensure the maintenance of the action does not offend "traditional notions of fair play and substantial justice." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 292, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

■ Plaintiffs have the burden of establishing personal jurisdiction. *Ziegler v. Indian River County,* 64 F.3d 470, 473 (9th Cir.1995). "It is well established [,however,] that where the district court relies solely on affidavits and discovery materials, the plaintiff need only establish a *prima facie* case of jurisdiction." *Rano v. Sipa Press, Inc.,* 987 F.2d 580, 587 n. 3 (9th Cir.1993) (citations omitted).

■ General personal jurisdiction refers to the authority of a court to hear any action involving a defendant regardless whether the action arose from the defendant's activities within the forum state. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 415, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). A district court has general personal jurisdiction over a defendant if the plaintiff shows the defendant has "substantial" or "continuous and systematic" contacts with the forum state. *Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.,* 223 F.3d 1082, 1086 (9th Cir.2000) (quoting *Helicopteros,* 466 U.S. at 415, 104 S.Ct. 1868). Pertinent factors for the court to consider are whether the defendant:

1. makes sales, solicits, or engages in business in the state,
2. serves the state's markets,
3. designates an agent for service of process,
4. holds a license, or
5. is incorporated in the state.

*Id.* (citing *Hirsch v. Blue Cross, Blue Shield of Kansas City,* 800 F.2d 1474, 1478 (9th Cir.1986)).

Defendants argue this Court lacks personal jurisdiction over the claims of Plaintiffs Sara and Derek Lapham. The Court notes personal jurisdiction is an issue of jurisdiction over the parties and generally is raised as to a defendant. Defendants do not make it clear whether they assert the Court lacks personal jurisdiction over Plaintiffs Sara Lapham and Derek Lapham, an unusual assertion for a defendant to make, or whether they contend the Court lacks personal jurisdiction over Defendant Nationwide.

■ Sara Lapham and Derek Lapham filed their Amended Complaint in this district. "Because the requirement of personal jurisdiction represents first of all an individual right, it can, like other such rights, be waived." *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 703, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982). "[A]n individual may submit to the jurisdiction of the court by appearance." *Id.* Sara Lapham and Derek Lapham have consented to this Court's personal jurisdiction by initiating their action in this Court.

■ Even if the Court construes Defendants' arguments as assertions that this Court lacks personal jurisdiction over Nationwide, Plaintiffs have provided sufficient evidence for this Court to find it has general personal jurisdiction over Nationwide. Nationwide has been licensed to sell insurance in Oregon since 1956 and has a registered agent, CT Corporation System, for service of process in Oregon. Nationwide also owns and hosts the website "www.nationwide.com," which allows policyholders, including those in Oregon, to sign up for a "MyNationwide" personal account. Finally, according to deposition testimony of Kim Austen, an employee of Allied, Nationwide issues insurance in Oregon under the "Allied Insurance umbrella." *See*

Friel Aff., Ex. 3 at 5. The Court, therefore, concludes it has general jurisdiction over Nationwide because Nationwide has continuous and systematic contacts with Oregon.[5]

Accordingly, the Court concludes it has personal jurisdiction over Plaintiffs Sara Lapham and Derek Lapham and Defendant Nationwide. The Court, therefore, denies that portion of Defendants' Renewed Motion for Summary Judgment based on a lack of personal jurisdiction.

### CONCLUSION

For these reasons, the Court **GRANTS in part** and **DENIES in part** Defendants' Renewed Motion for Summary Judgment (# 57).

IT IS SO ORDERED.

---

5. Plaintiffs also contended Nationwide waived the defense of lack of personal jurisdiction when it filed a Motion to Dismiss under Fed. R.Civ.P. 12(b)(6) on November 7, 2001, without raising a jurisdictional defense. Sara Lapham and Derek Lapham did not join as plaintiffs, however, until after Nationwide filed its Motion to Dismiss. Because the defense, therefore, was not available when Nationwide filed its Motion, there could be no waiver pursuant to Fed.R.Civ.P. 12(g) and (h)(1).